## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE; BRAZILIAN WORKER CENTER, INC.; LA COLABORATIVA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; U.S. SOCIAL SECURITY ADMINISTRATION; MARCO RUBIO, in his official capacity as Secretary of State; MICHELLE KING, in her official capacity as Acting Commissioner of U.S. Social Security Administration, <br><br> Defendants. | Civil Action No. 25-10135-LTS |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ------------------------------------------------------------------- ii

INTRODUCTION ------------------------------------------------------------------------ 1

FACTUAL AND PROCEDURAL BACKGROUND ----------------------------------------- 5

ARGUMENT ----------------------------------------------------------------------------- 6

    I.   Legal Standard ------------------------------------------------------------------ 6

    II.   Plaintiffs Are Likely to Succeed On The Merits. ------------------------------------- 6

        A.   Plaintiffs Are Likely To Succeed On Their Citizenship Clause Claim. ------------------ 6

        B.   Plaintiffs Are Likely To Succeed On Their Claim Under 8 U.S.C. § 1401. ------------- 10

        C.   Plaintiffs Are Likely To Succeed On Their Claim Under The Administrative Procedure Act. 10

    III.   In The Absence of Preliminary Relief, Plaintiffs Will Suffer Irreparable Harm. ------- 11

        *A.*   *The EO Would Make Children Deportable At Birth And Render Many Of Them "Stateless"* -------------------------------------------------------------------- 11

        B.   Children Subject To The EO Would Be Stripped Of The Numerous Benefits Of U.S. Citizenship. ------------------------------------------------------------------- 14

        C.   Children Subject To The EO Would Suffer Compromised Health and Decreased Housing Access. ------------------------------------------------------------------ 14

    IV.   The Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor. ------ 16

CONCLUSION -------------------------------------------------------------------------- 19

# TABLE OF AUTHORITIES

## CASES

*Afroyim v. Rusk*, 387 U.S. 253 (1967)-------------------------------------------------------11, 14, 17

*Alongi v. AMCO LLC*, No. 15-CV-12349, 2015 WL 12766154 (D. Mass. Sept. 23, 2015) ------22

*Bostock v. Clayton County*, 580 U.S. 644 (2020)-------------------------------------------------14

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir.

    1986) -------------------------------------------------------------------------------------------18

*CellInfo, LLC v. Am. Tower Corp.*, 352 F.Supp. 3d 127 (D. Mass. 2018) -------------------------- 9

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)---------------------------------15

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)-------------------------------15

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).-------------------------------------------- 9

*Dred Scott v. Sandford*, 60 U.S. 393(1858).-------------------------------------------------------5, 11

*Dorce v. Wolf*, 506 F.Supp. 3d 142 (D. Mass 2020) …………………………………………….21

*Fedorenko v. United States*, 449 U.S. 490 (1981) --------------------------------------------------- 7

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) --------------------------------------------------15

*Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. 99 (1830)-----------------------------------------12

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963)-----------------------------------------------18

*Landon v. Plasencia*, 459 U.S. 21 (1982)------------------------------------------------------------16

*Largess v. Supreme Judicial Court for Mass.*, 373 F.3d 219 (1st Cir. 2004) -----------------------10

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)--------- 8, 21, 22

*McBreairty v. Sch. Bd. of RSU 22*, 616 F. Supp. 3d 79 (D. Me. 2022)-------------------------------22

*Nken v. Holder*, 556 U.S. 418 (2009)-------------------------------------------------------------8, 20

*Norris on Behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12 (1st Cir. 2020) --------------10

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ------------------------------------------------------------- 7

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ------------------------------------------------------------16

*Plyler v. Doe*, 457 U.S. 202 (1982) -------------------------------------------------------------------17

*Rio Grande Cmty. Health Ctr., Inc*., 397 F.3d 56 (1st Cir. 2005) -------------------------------- 20, 22

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996)-----------------------18

*Savino v. Souza*, 459 F. Supp. 3d 317 (D. Mass. 2020)-----------------------------------------------22

*State of New Jersey et al. v. Trump et al*., 25-CV-10139 (D. Mass. filed Jan. 21, 2025). ---------- 9

*State of Washington et al. v. Trump et al.*, 25-CV-0127, Dkt. 43 (W.D. Wash. Jan. 23, 2025) --10

*The Schooner Exchange v. McFadden*, 11 U.S. 116 (1812) ------------------------------------------12

*Trop v. Dulles*, 356 U.S. 86 (1958) ------------------------------------------------------------------ 7

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898) -------------------------------------12, 13, 14

*Westenfelder v. Novo Ventures (U.S.), Inc.*, 797 F.Supp. 2d 188 (D. Mass. 2011) -----------------22

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)------------------------------------------ 6

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ------------------------------------------------------------------------11

## STATUTES

5 U.S.C. § 706 --------------------------------------------------------------------------------- 14, 15

8 U.S.C. § 1401---------------------------------------------------------------------------------- 6, 14, 15

## SECONDARY SOURCES

James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006)------------------------------------------------11

Jonathan C. Drimmer, *The Nephews of Uncle Sam: The History, Evolution, and Application of Birthright Citizenship in the United States*, 9 Geo. Immigr. L.J. 667 (1999)--------------------12

Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405 (2020) ---------11

-

## INTRODUCTION

By this motion, Plaintiffs seek a preliminary injunction to stop Defendants from implementing a January 20, 2025 Executive Order (the "EO") that purports to strip citizenship from thousands of Americans with the stroke of a pen.[1] The EO is as illegal as it is unprecedented—and the harms that would flow from its implementation are immense. A preliminary injunction is necessary to preserve the *status quo* and avoid immeasurable harm to Plaintiffs.

Defendant Trump issued the EO within hours of his inauguration as President. Contrary to the explicit language of the U.S. Constitution and to settled Supreme Court precedent, the EO declares that as of February 19, 2025, broad swaths of individuals born on American soil will no longer be considered citizens. It directs federal agencies, including Defendants U.S. Department of State and U.S. Social Security Administration, to stop issuing documents recognizing United States citizenship for such individuals.

But a President has no such power. Birthright citizenship is explicitly written into the U.S. Constitution and protected by federal statute. If this unparalleled assault on the sanctity and integrity of U.S. citizenship is allowed to go into effect, it would create a permanent underclass and return our nation to the dark days of *Dred Scott*—the ignoble Supreme Court decision that denied citizenship to enslaved people and that the Fourteenth Amendment was enacted to rebuke. 60 U.S. 393, 404 (1858).

Plaintiffs are among the many thousands who would be immediately and irreparably harmed by the EO. O. Doe is an expectant immigrant mother, due in March 2025, whose child's

---

[1] The Executive Order, entitled "Protecting the Meaning and Value of American Citizenship," is attached as Exhibit A to the Complaint. *See* ECF No. 1-1.

citizenship—with all the many benefits that entails—is at imminent risk. Plaintiffs Brazilian Worker Center and La Colaborativa are two non-profit organizations whose membership includes numerous individuals who would similarly suffer severe harm if the EO were implemented. As demonstrated in this brief and through concurrently-filed declarations,[2] Plaintiffs more than surpass the four-part standard for issuance of a preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (outlining likelihood of success on the merits, irreparable harm, balance of equities, and public interest as requisite factors for injunctive relief).

First, Plaintiffs' likelihood of success on the merits is extremely high. The EO is flatly contrary to a) the plain language of the Citizenship Clause of the Fourteenth Amendment; b) binding U.S. Supreme Court authority; and c) federal statutory law that codifies the protections of the Citizenship Clause. *See infra* at 6-9. The EO also violates the Administrative Procedure Act (APA). *See infra* at 10-11.[3]

---

[2] *See* Declaration of O. Doe ("Doe Dec."); Declaration of Gladys Vega, the President and CEO of Plaintiff La Colaborativa ("Vega Dec."); Declaration of Lenita Reason, the Executive Director of Plaintiff Brazilian Worker Center ("Reason Dec."); Declaration of Leon Rodriguez, former Director of United States Citizenship and Immigration Services ("Rodriguez Dec."); Declaration of Dr. Fiona S. Danaher, M.D., M.P.H., pediatrician for Massachusetts General Hospital ("Danaher Dec."); Declaration of Dr. Rose L. Molina, M.D., M.P.H., obstetrician-gynecologist at The Dimock Center (a federally qualified community health center) and Beth Israel Deaconess Medical Center ("Molina Dec."); Declaration of Carol Galletly, PhD, an expert who has performed nationwide empirical research at the intersection of public health and immigration ("Galletly Dec."); Declaration of Professor Daniel Kanstroom at Boston College Law School, who has trained federal and state judges, prosecutors and attorneys in the intricacies of immigration law ("Kanstroom Dec."); Declaration of Katherine Culliton-González, the former Officer for Civil Rights and Civil Liberties at the U.S. Department of Homeland Security ("Culliton-Gonzalez Dec."); Declaration of Armen H. Merjian of Housing Works, a non-profit organization in New York dedicated to ending the twin crises of homelessness and HIV ("Merjian Dec.").

[3] By this motion, Plaintiffs move for relief based on their claims under the Citizenship Clause, 8 U.S.C. § 1401, and the APA. Plaintiffs' complaint also pleads a cause of action under the Fifth Amendment. Plaintiffs do not move for preliminary relief on that ground but reserve the right to pursue it as the litigation progresses.

Second, the harm that Plaintiffs will suffer if the EO is not enjoined is both irreparable and massive. The act of stripping someone of their citizenship is so grave that the Supreme Court has called it "a form of punishment more primitive than torture" that "amounts to the total destruction of the individual's status in organized society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Citizenship lies at the heart of a person's identity; de-naturalization is highly stigmatizing and forces those subject to it to live with the uncertainty and fear that comes with the imminent threat of banishment from their native country. *See, e.g.*, *Fedorenko v. United States*, 449 U.S. 490, 525 n.14 (1981) (all citizens are lawfully entitled "to enjoy the benefits of citizenship in confidence and without fear"). *see also Obergefell v. Hodges*, 576 U.S. 644, 663 (2015) (affirming the centrality of "individual dignity and autonomy").

Declarations accompanying this Motion attest to the magnitude of this harm. Plaintiff O. Doe—like thousands of others in her position throughout the country—testifies how she now lives in intense fear that her child will be born stateless, thrust at birth into a highly vulnerable, unsafe, and precarious position and stripped of the protections of citizenship. Plaintiffs Brazilian Worker Center and La Colaborativa aver about similar impending harm for their members, whose children—citizens under the Fourteenth Amendment—will now have "their legal status and rights… constantly questioned and challenged." Reason Dec. ¶14; *see also* Vega Dec. ¶11 (describing "panic" of members facing prospect of children who should be recognized as citizens instead being "stigmatized, excluded, and alienated in the only country they know as home").

The intense anxiety that Plaintiff Doe and Plaintiffs' members are currently experiencing is entirely justified, because the practical impacts of de-naturalization are so enormous.  As the former Director of United States Citizenship and Immigration Services (USCIS) puts it in his declaration, children "would become instantly deportable by virtue of having no recognized

3

immigration status in the United States. Many would be rendered stateless, because they would also have no ties to any other country." Rodriguez Dec. ¶8.

The harms cascade from there. As doctors from leading medical institutions attest, stripping children of their citizenship immediately puts them at much greater health risk. *See* Danaher Dec. ¶7 (MGH pediatrician testifying that "[e]liminating birthright citizenship would not only expand the population of undocumented children with reduced access to healthcare….; it would create a new, more vulnerable subpopulation of stateless children"); Molina Dec. ¶¶9-10 (Beth-Israel OB-GYN describing how "a child's citizenship status significantly impacts their access to healthcare and health outcomes…. Infants are among the most vulnerable populations…."). Loss of citizenship has a similarly dramatic impact on access to such basic necessities as safe housing and food. *See* Merjian Dec. ¶¶ 4-7 (describing enormous housing access gulf between those with citizenship and those without); Danaher Dec. ¶9.

As to the third and fourth factors of the preliminary injunction test—the balance of harms and the public interest—those "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). These factors weigh even more heavily in Plaintiffs' favor than in the usual case where the government is the defendant, due to the extreme disruption that would occur throughout American society if the bedrock principle of birthright citizenship were eroded. *See* Rodriguez Dec. ¶7 (former Director of USCIS describing how the EO "would immediately cause significant disruption and chaos throughout many different facets of American life….because we as a nation have built up numerous different systems that are designed on the foundational premise that a birth certificate reflecting birth within the United States constitutes proof of U.S. citizenship."); *see also*

Kanstroom Dec. ¶12 (immigration specialist describing how "[t]he consequences of even a short-lived Executive Order of this type would involve intolerable legal chaos"); Galletly Dec. ¶¶6-8 (outlining grave public health impacts).

If the EO is allowed to take effect, even if it is later enjoined, it will distort and contort American society with a conception of citizenship that has been outlawed by the Constitution, prohibited by Supreme Court precedent, and rejected by Congress. It will cause grievous harm to Plaintiffs and thousands of others like them. Plaintiffs therefore respectfully urge the Court to exercise its broad equitable powers to enter a preliminary injunction to "freez[e] the status quo…." *CellInfo, LLC v. Am. Tower Corp.*, 352 F.Supp. 3d 127, 135 (D. Mass. 2018); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## FACTUAL AND PROCEDURAL BACKGROUND

On January 20, 2025, Defendant Trump issued the challenged Executive Order, which purports to strip citizenship from children born in the United States whose mother is "unlawfully present" or whose presence is "unlawful but temporary" and whose father is not a citizen or a lawful permanent resident. EO, Sec. 2(a). It states that it shall apply to persons born within the United States after 30 days from the date of the order (February 19, 2025). *Id*. Sec. 2(b).

Plaintiffs filed this action the same day that the EO was issued.  The following day, a coalition of States ("the States") filed an action in this same District, also challenging the EO.[4]  On January 21, 2025, the States filed a Motion for Preliminary Injunction. *State of New Jersey et al. v. Trump*, Dkt. 3. On January 23, 2025, the Honorable John C. Coughenour issued a 14-day

---

[4] *State of New Jersey et al. v. Trump et al*., 25-CV-10139 (D. Mass. filed Jan. 21, 2025). At the time of this filing, the States' case is pending before this Court as a related case; however, the Court has ordered the States to show cause why the case should not be returned to the Clerk for random assignment. Dkt No. 26.

Temporary Restraining Order in the U.S. District Court of the Western District of Washington in a case also challenging the EO. *State of Washington et al. v. Trump et al.*, 25-CV-0127, Dkt. 43 (W.D. Wash. Jan. 23, 2025).

## ARGUMENT

### I.    <u>Legal Standard</u>

"When assessing a request for a preliminary injunction, a district court must consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Norris on Behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (citations and quotations omitted). "The decision whether to grant relief is based on a balancing of the different factors, with likelihood of success playing a pivotal role." *Largess v. Supreme Judicial Court for Mass.*, 373 F.3d 219, 223 n.2 (1st Cir. 2004).

### II.    <u>Plaintiffs Are Likely to Succeed On The Merits.</u>

A. <u>Plaintiffs Are Likely To Succeed On Their Citizenship Clause Claim.</u>

It is well-settled that the Citizenship Clause bestows American citizenship upon anyone born in the United States regardless of their parentage, subject to only a few rare and well-defined exceptions. The Supreme Court has espoused this broad interpretation for over a century, and its holding is amply supported by the plain text and history of the Fourteenth Amendment. In flagrant disregard of these principles, the EO operates to deny citizenship status to an enormous class of people who are entitled to that status by virtue of their birth on U.S. soil. The President simply does not have the power to limit the constitutional guarantee of birthright citizenship in this way. As a result, the EO is a blatant violation of the Fourteenth Amendment.

The text of the Citizenship Clause is straightforward. It states that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. Const. amend. XIV, § 1. The text of the Amendment includes no hereditary or racial prerequisite to citizenship—a very intentional choice by the Reconstruction Congress that wrote it. As the Supreme Court has explained, one of the drafters' aims in "giving permanence and security to citizenship in the Fourteenth Amendment" was to overturn the Court's 1858 decision in *Dred Scott v. Sandford*, which endorsed an explicitly racist and hereditary view of American citizenship. *See Afroyim v. Rusk*, 387 U.S. 253, 262 (1967).[5]

Thus, under the Citizenship Clause, the citizenship of those born in the United States is limited only by the qualifying language "subject to the jurisdiction thereof." U.S. Const. amend. XIV, § 1. That meaning is easily ascertained by reference to history, ordinary usage, and—most importantly—long-settled Supreme Court precedent. All three support that the word "jurisdiction" refers to the United States' sovereign lawmaking authority. With that in mind, "subject to the jurisdiction thereof" refers to anyone to whom United States law applies. Or, put another way, it excludes only those with some kind of recognized immunity from American law.

During Congressional debate over the meaning of the Citizenship Clause, the Clause's proponents made statements indicating they understood it to codify the prevailing common law view of birthright citizenship in effect prior to *Dred Scott*.[6] That common law view known as "jus

---

[5] The Court's infamous opinion in *Dred Scott* held that only individuals descended from people considered "citizens" by the framers were entitled to citizenship at birth, and that this excluded the descendants of slaves who had been, at the time of the framing, "subjugated by the dominant race" and considered "subordinate." *Dred Scott*, 60 U.S. at 404.

[6] *See* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 441 n.173 (2020) (quoting statement of Clause's drafter); James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 369-371 (2006) (quoting statements from Congressional debate); Jonathan C. Drimmer, *The Nephews*

soli," had been widely embraced by early American courts and stood for the proposition that citizenship is acquired by birth within the sovereign's territory.[7] Supreme Court Justice Joseph Story discussed this broad conception of territorial birthright citizenship in 1830, writing that "[n]othing is better settled at the common law than the doctrine *that the children even of aliens born in a country*, while the parents are resident there under the protection of the government, and owing a temporary allegiance thereto, are *subjects by birth*." *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. 99, 164 (1830) (Story, J.) (emphasis added). Justice Story also outlined that there are only a few exceptions to jus soli citizenship, including the children of ambassadors and invading soldiers who are not "subject[s]" of the state when within the territory. *Id.* at 155-156.

Jus soli and its exceptions comport with the idea of sovereign "jurisdiction" that Chief Justice John Marshall outlined in 1812. In a case called *The Schooner Exchange v. McFadden*, the Chief Justice explained that "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute" except as applied to foreign "sovereign[s]," "ministers," and "troops" who have some degree of immunity from local laws. 11 U.S. 116, 136-140 (1812). He then elaborated on the applicability of U.S. law to foreigners more generally, writing that "[w]hen private individuals of one nation spread themselves through another … it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction … if such individuals … were not amenable to the jurisdiction of the country." *Id.* at 144. This supports not only that the term "jurisdiction," as used in the early 19th century, referred to American lawmaking power, but also that foreigners were generally considered subject to that "jurisdiction."

---

*of Uncle Sam: The History, Evolution, and Application of Birthright Citizenship in the United States*, 9 Geo. Immigr. L.J. 667, 696 n.211 (1999) (quoting and citing Congressional statements).
[7] *See United States v. Wong Kim Ark*, 169 U.S. 649-664 (1898) (citing cases); Ho, *supra* note 2 at 369, 369 n.15 (2006) (citing cases); Drimmer, *supra* note 2 at 683-685 (citing cases).

The Supreme Court's 1898 decision in *United States v. Wong Kim Ark* definitively established that Congress intended "subject to the jurisdiction thereof" to enshrine the jus soli principle of broad, territorial birthright citizenship into the Constitution. 169 U.S. 649 (1898). The Plaintiff in that case, Wong Kim Ark, was born in San Francisco to non-citizen parents from China who were living and working in the United States. In 1894, as an adult, he left the United States for a temporary visit to China. When he returned, Customs denied him entry into the country under the Chinese Exclusion Acts, which "prohibit[ed] persons of the Chinese race, and especially Chinese laborers, from coming into the United States...." *Id.* at 653. Wong challenged his exclusion in federal court, and the case turned on whether he was "subject to the jurisdiction" of the United States when he was born in the U.S. to non-citizen parents. *Id.*

The Court found that he was. It exhaustively discussed the history of birthright citizenship in England, the American colonies, and the early United States, and concluded that "[t]he real object of the fourteenth amendment of the constitution, in qualifying the words 'all persons born in the United States' by the addition 'and subject to the jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest words" the classes of people whose children had been excluded from birthright citizenship at common law, like the "children of diplomatic representatives." *Id.* at 682. Emphasizing the Citizenship Clause's broad applicability, the Court held that it includes "the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States" and that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693.

All of this establishes beyond doubt that the EO's policy of refusing to recognize citizenship based solely on parentage violates the Fourteenth Amendment. Pursuant to *Wong Kim*

*Ark*, the citizens targeted by the EO are *ipso facto* American citizens due to their birth within the United States, regardless of the immigration status of their parents. *See Wong Kim Ark*, 169 U.S. at 682. However much Defendant Trump may disagree with the Fourteenth Amendment's expansive guarantee of birthright citizenship, that right attaches at the time of birth on American soil and cannot be "shifted, canceled, or diluted at the will of the Federal Government." *Afroyim*, 387 U.S. at 262.

B.  <u>Plaintiffs Are Likely To Succeed On Their Claim Under 8 U.S.C. § 1401.</u>

The Citizenship Clause's broad grant of birthright citizenship is also codified by 8 U.S.C. §1401. This statutory provision was originally enacted in 1940 when *Wong Kim Ark* had long been the settled law of the land, and it mirrors the language of the Citizenship Clause, stating that "The following shall be nationals and citizens of the United States at birth: a) a person born in the United States, and subject to the jurisdiction thereof ...." Because the EO violates the Citizenship Clause, it also violates the parallel statutory protections of 8 U.S.C §1401.  *See Bostock v. Clayton County*, 580 U.S. 644, 654 (2020) (noting that courts must interpret a statute "in accord with the ordinary public meaning of its terms at the time of its enactment").

C.  <u>Plaintiffs Are Likely To Succeed On Their Claim Under The Administrative Procedure Act.</u>

Similarly, because the EO directs federal agencies to act unconstitutionally and contrary to federal statute, it is also unlawful under the APA. Pursuant to the Act, courts must hold unlawful and set aside agency action that is arbitrary and capricious, unconstitutional, contrary to statute, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A-D). The EO bars all executive departments and agencies from issuing documents recognizing United States citizenship to individuals targeted by the EO. EO, Sec. 2(a). It also directs Defendants Rubio and King, among other agency heads, to ensure that no one within their agency "act, or forbear from acting, in any

manner inconsistent with this order." *Id.* §3(a).  This agency action directly conflicts with the Citizenship Clause and 8 U.S.C. § 1401, for the reasons set forth above. *See supra* at 11-15. Accordingly, it must be held unlawful and set aside. 5 U.S.C. § 706; *see also Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive"); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996) (explaining that agency action implementing an executive order does not insulate it from judicial review under the APA); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) (same).

### III.    In The Absence of Preliminary Relief, Plaintiffs Will Suffer Irreparable Harm.

Forcibly robbing Americans of their citizenship would trigger a destabilizing cascade of harm and suffering. As documented in supporting declarations, the harm is multifaceted and compounding. The harm would also be immediate, "particularly on the health, legal stability, and well-being of children born to immigrant parents." Vega Dec. ¶ 5.

### A.    *The EO Would Make Children Deportable At Birth And Render Many Of Them "Stateless"*

To begin with, the EO would render newborns covered by the EO deportable at birth, without any immigration status. As a former Director of the United States Citizenship and Immigration Services explains, "Babies who are born after February 19, 2025 and fall into the categories listed in the EO would … have no immigration status at all. We simply do not have any legal structures in place in the United States to recognize such babies as anything other than U.S. citizens." Rodriguez Dec. ¶8. They would thus become "instantly deportable." *Id.* ¶9.

Plaintiff Doe, for example, is originally from Haiti and cannot return due to political instability and the well-documented "collapse of Haiti." Doe Dec. ¶¶ 1-2. The abject fear she feels for her child is thus fully justified. *Id.* ¶¶ 8, 11 ("[A]fter learning about the Executive Order, I was overwhelmed with anxiety….How can I keep my child safe from being deported to a collapsed Haiti?"). Organizational Plaintiffs' members are experiencing similar panic at the prospect that their babies, once born, would be instantly deportable. Vega Dec. ¶14 ("raising children deemed 'stateless or lacking full citizenship rights would cause immense stress and anxiety").[8] Subjecting U.S. citizen children and their families to the possibility that the children may be deported at any time is brutal, cruel, and unlawful. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (noting the utmost importance of the right "to stay and live and work in this land of freedom"); *Padilla v. Kentucky*, 559 U.S. 356, 357 (2010) (noting the importance of "preserving the right to remain in the United States") (citation and internal quotation omitted). Any ultimate adjudication in Plaintiffs' favor in this case would be too late if their U.S.-born children were deported in the meantime—the epitome of irreparable harm. *See Padilla*, 559 U.S. at 374 (recognizing the "seriousness of deportation" and "the concomitant impact of deportation on families…"); Kanstroom Dec. ¶13 ("Wrongful

---

[8] The very idea that the United States would deport babies even though their mothers are legally here in the country is repugnant, but similar conduct is not unknown to Defendants. *See* Ankush Khardori, *How America Forgot About One of Trump's Most Brutal Policies*, Politico (Oct. 28, 2024), https://www.politico.com/news/magazine/2024/10/28/trump-immigration-family-separation-00185512 (detailing family separation policy). Moreover, within the first days of his current administration, Defendant Trump has authorized immigration enforcement in hospitals, and has stated that no one is off limits. *See* Brian Mann, *Churches, schools are no longer off limits to agents rounding up undocumented migrants*, NPR (Jan. 22, 2025), https://www.npr.org/2025/01/22/nx-s1-5269859/churches-schools-are-no-longer-off-limits-to-agents-rounding-up-undocumented-migrants

deportations not only cause tremendous emotional distress; but they are physically dangerous and extremely difficult to rectify once a U.S. citizen is sent to a foreign country.").

Moreover, because many children subject to the EO, like Plaintiff Doe's child, would have no ties to any other country, they would be rendered "stateless," a grievous harm in and of itself. Doe Dec. ¶7;  Kanstroom Dec. ¶17 ("Many [covered by the EO] would be stateless, and thus without the protection of any government at all."); *see also Afroyim*, 387 U.S. at 268 (noting that stateless status is a harm). This lack of any status leads to its own set of injuries: "Statelessness eliminates not just social citizenship but also medical citizenship." Danaher Dec. ¶¶7-8 (internal quotations and citations omitted) (concluding that stateless individuals "tend to experience worse health outcomes and shorter lifespans"). "The health burdens of statelessness would further exacerbate existing racial inequities in pediatric health outcomes, not only among directly affected children, but among U.S. citizen children as well." *Id.* ¶ 10.

Moreover, these harms would fall not just upon the child covered by the EO, but upon whole families: "The prospect of raising children deemed 'stateless' or lacking full citizenship rights would cause immense stress and anxiety, undermining the mental health and stability of entire families." Vega Dec. ¶1; Doe Dec. ¶¶ 9-10.

If the EO is not blocked, children would become second-class citizens in their own country of birth—an unbearable and stigmatizing condition forbidden by the Constitution. *Plyler v. Doe*, 457 U.S. 202, 213 (1982); *see also* Reason Dec. ¶8 (Plaintiffs are "afraid to expose their newborn children to additional scrutiny, stigma, or discrimination."); Vega Dec. ¶13 ("Our members are deeply concerned about the emotional toll this policy would take on their children, who may grow up feeling stigmatized, excluded, and alienated in the only country they know as home."). The result would be that "[c]hildren born in the U.S. would

essentially be relegated to a subordinate caste of native-born Americans." Kanstroom Dec. ¶17.
This loss of reputation and dignitary harm is irreparable.  *See Ross-Simons of Warwick, Inc. v.*
*Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996); *Camel Hair & Cashmere Inst. of Am., Inc. v.*
*Associated Dry Goods Corp.*, 799 F.2d 6, 16 (1st Cir. 1986) (remanding for the issuance of a
preliminary injunction to safeguard "protectable interest" in reputation).

> ### B.   Children Subject To The EO Would Be Stripped Of The Numerous Benefits Of U.S. Citizenship.

"Citizenship is a most precious right." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144,
159 (1963). It confers "full membership of a community" and "a unique bundle of privileges
and benefits," Kanstroom Dec. ¶¶ 5-6, all of which would be lost if the EO were to go into
effect. Concrete benefits that would be lost include the ability to travel freely with a U.S.
passport. *Id.* ¶13 ("Families of newborn children routinely apply for passports sometimes for
emergency reasons to visit and help to care for sick relatives or to attend funerals with their
young U.S.-born children."). Other rights that would be lost include "the right to reside in the
United States, the right not to face deportation under any circumstances, the right to vote in
federal elections, the right to hold certain political offices and government positions, the ability
to leave and to re-enter the United States freely unencumbered by immigration criteria and
processes, and eligibility for various public benefits." Kanstroom Dec. ¶6; *see also* Merjian
¶12 (noting "very real risk of plunging huge numbers into a downward spiral").

> ### C.   Children Subject To The EO Would Suffer Compromised Health and Decreased Housing Access.

Implementation of the EO would also put children's health at risk, because health
outcomes are directly tied to citizenship. *See* Danaher Dec. ¶4 ("A growing body of scientific
literature demonstrates that policies of exclusion based on immigration status harm children in

immigrant families by directly and indirectly diminishing access to public benefits such as healthcare, nutrition, and educational opportunities, while promoting bullying, fear, and chronic stress.") (citing authorities); *see also* Molina Dec. ¶9 ("A child's citizenship status significantly impacts their access to healthcare and health outcomes.").

This is in part because certain health programs are only available to citizens or those with other defined immigration status. *Id.* (noting that "U.S. citizenship ensures eligibility for vital programs like Medicaid and the Children's Health Insurance Program (CHIP), providing preventive care, immunizations, and treatment that support healthy development."); *see also* Danaher Dec. ¶5 ("Income-eligible children whose immigration status bars eligibility for public health insurance programs are uninsured at more than seven times the rate of comparable children with U.S. citizenship."). In addition, fear and uncertainty often prevent non-citizen immigrants from accessing even healthcare to which they are entitled. Vega Dec. ¶10 (individuals "who are undocumented may delay or avoid seeking medical care altogether due to confusion, fear of deportation, or stigma, putting their children at heightened risk for untreated conditions and developmental delays.").[9]

All of these adverse health outcomes are foreseeable harms for children who would be stripped of their citizenship under the EO. As courts have often recognized, interruption of healthcare is harmful and irreparable, as it "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued

---

[9] This lack of adequate healthcare is particularly perilous for infants. Molina Dec. ¶11 ("Infants with citizenship are more likely to access routine care without barriers, leading to better management of chronic conditions, early detection of issues, and overall improved health. By contrast, infants without citizenship often face restricted access, delays in care, and greater exposure to health disparities. These obstacles can result in untreated conditions, undermining their well-being.").

damages remedy." *See*, *e.g.*, *Rio Grande Cmty. Health Ctr., Inc.*, 397 F.3d 56, 76 (1st Cir. 2005) (preliminary injunction averted harm to low-income medically underserved populations).

The immediate harm from implementation of the EO also extends to housing insecurity and the deprivation of benefits essential to the American social safety net. For example, "citizenship confers upon families the ability to secure subsidized or public housing." Merjian Dec. ¶4. Experts have consistently found that "[i]n both public and private housing markets, United States citizens tend to fare better than non-citizens, particularly those who are undocumented." *Id*. (noting "undocumented individuals are ineligible for most housing assistance programs, such as Section 8 and myriad state and local housing voucher and subsidy programs"). Since "stable housing is the wellspring to education, employment, health, wealth accumulation, and prosperity," Defendants are placing families in jeopardy. *Id*. (noting that "without stable housing, it is impossible to store medication and fresh food, regularly attend medical appointments, and to maintain a strict medical regimen"). In fact, "[l]ack of legal status renders families of the undocumented disproportionately impecunious, and as a result, such families are often forced to live in overcrowded, unsafe, unsanitary, and unstable conditions. *Id*. ¶ 9. Thus, the EO "would cause endless pain and suffering to countless individuals and their families and only exacerbate a homelessness crisis that has reached staggering proportions in municipalities throughout the United States." *Id*. ¶12.

## IV.    <u>The Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor.</u>

The third and fourth factors typically considered by the Court—the balance of harms and the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. In this case, both factors together weigh heavily in favor of Plaintiffs. "There is

generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States*, 838 F.3d at 12 (internal quotations and citations omitted). The public interest weighs in favor of allowing injunctive relief because it is "always in the public interest to prevent the violation of a party's constitutional rights." *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (internal citations and quotations omitted).

Here, the public interest would be significantly harmed by the chaos the EO will bring about, not only to the targeted individuals but to everyone. Although the Administration's targets are immigrants, elimination of birthright citizenship will significantly burden people of all immigration statuses. As the former head of USCIS explains, for example, the process for obtaining a Social Security card after a child's birth is currently simple, facilitated by hospitals through the Enumerated at Birth program. Rodriguez Dec. ¶11; Molina Dec. ¶5 (same). However:

> The EO would change all that—not just for undocumented individuals but for everyone. Even in the case of a baby born to two U.S. citizen parents, a birth certificate reflecting a birth within the United States would no longer establish the baby's citizenship. The parents would have to prove their own status first. Even if it were deemed acceptable for citizen-parents to do so by producing their own birth certificates (which would appear illogical, if that does not serve as proof for individuals born after February 19, 2025), that would be an extraordinarily cumbersome process compared to what exists today.

> Moreover, it is not clear to whom they would produce those documents: to the hospitals where their child's birth occurred (which have no training or ability to manage such a process)? To the local jurisdiction where their child was born? To the one where they reside? The state? To a federal agency? There does not currently exist in the United States a centralized database of U.S. citizens. Even if one could be created, and a process for determining who goes into it, that most certainly could not be accomplished within 30 days. Thousands of people would be required to hire immigration attorneys to help with this process, at immense burden and cost.

17

Rodriguez Dec. ¶¶ 12-13; *see also* Kanstroom Dec. ¶12 ("the consequences of even a short-lived Executive Order … would involve intolerable legal chaos and potentially irremediable harm to individuals, families, and communities."); Culliton-González Dec. ¶6 (same).

Public health would similarly be compromised—to the detriment of everyone. Galletly Dec. ¶6 ("[p]ublic health disease control efforts could be undermined as undocumented immigrants seek to avoid detection"); *see also* Danaher Dec. ¶9 (noting "unmet basic needs have been shown to drive up emergency room, urgent care, and mental health visits among children").

On the opposite side of the balance, there is no injury to the government at all in preserving the *status quo* that has existed in this country for over 150 years. Injunctive relief is particularly appropriate where it "causes minimal hardship to the government or injury to the public." *Savino v. Souza*, 459 F. Supp. 3d 317, 332 (D. Mass. 2020) (granting preliminary injunction); *see also Alongi v. AMCO LLC*, No. 15-CV-12349, 2015 WL 12766154, at *1 (D. Mass. Sept. 23, 2015) (noting that issuance of preliminary injunction would "not cause undue inconvenience or loss" to defendant); *Rio Grande Cmty. Health Ctr.*, 397 F.3d at 77 (finding that preliminary injunction against the government "can hardly be considered substantial interference"); *League of Women Voters of United States*, 838 F.3d at 12 (granting preliminary injunction because it would "not substantially injure other interested parties") (internal citations and quotations omitted); *McBreairty v. Sch. Bd. of RSU 22*, 616 F. Supp. 3d 79, 98 (D. Me. 2022) (granting relief); *Westenfelder v. Novo Ventures (U.S.), Inc.*, 797 F.Supp. 2d 188, 191 (D. Mass. 2011) (same).

Finally, the public interest is served by a judicial ruling that makes clear that a President cannot unilaterally revoke citizenship. Just the issuance of the EO has caused widespread panic

within immigrant communities. It is already "creat[ing] a chilling effect, deterring immigrant families from seeking critical services, such as health care…." Vega Dec. ¶15; Reason Dec. ¶8 ("Several expecting mothers have arrived at [Plaintiff's] Welcome Center seeking stable housing and other resources, but they are already saying that they are hesitant to seek help because of the Executive Order.").

There is no harm to Defendants from complying with the explicit terms of the Constitution and maintaining the principle of birthright citizenship that has existed in this country for generations, and the public interest is served by an injunction preserving that *status quo*.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs urge the Court to enter an order preliminarily enjoining Defendants from implementing the challenged Executive Order.

Dated:  January 23, 2025                    Respectfully submitted,

/s/  *Oren Sellstrom*
Oren Sellstrom (BBO #569045)
Iván Espinoza-Madrigal (BBO # 708080)
Jacob Love (BBO #699613)
Mirian Albert (BBO #710093)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 482-1145
osellstrom@lawyersforcivilrights.org

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2025, the above-captioned document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

_/s/Oren Sellstrom_____