IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| O. DOE; BRAZILIAN WORKER CENTER, INC.; LA COLABORATIVA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; U.S. SOCIAL SECURITY ADMINISTRATION; MARCO RUBIO, in his official capacity as Secretary of State; MICHELLE KING, in her official capacity as Acting Commissioner of U.S. Social Security Administration,<br><br>Defendants. | Civil Action No. 25-10136-LTS |

### DECLARATION OF DANIEL KANSTROOM

I, Daniel Kanstroom, make the following declaration based on my personal knowledge. I declare under the penalty of perjury that the following is true and correct:

**Background and Experience**

1. I am Professor of Law with tenure, Faculty Director of the Rappaport Center for Law & Public Policy, and Dean's Distinguished Scholar at Boston College Law School. My areas of academic expertise include Human Rights, Refugee Law, Immigration Law, and Administrative Law.

2. In addition to my academic work, I founded the Boston College Immigration and Asylum Clinic. I served for more than a decade as Co-Director of the Boston College Center for Human Rights and International Justice. I created the Post-Deportation Human Rights

1

    Project to conceptualize and develop a new field of law, while representing U.S. deportees abroad and undertaking empirical studies of the effects of deportation on families and communities.

3. Together with my students, I have litigated many immigration and asylum cases and provided counsel for hundreds of clients over more than 40 years of practice as a lawyer. I have also organized innumerable public presentations in schools, churches, community centers, courts and prisons, and advised community groups. I have trained federal and state judges, prosecutors and defense attorneys in the intricacies of US immigration law.

4. I have published widely in the fields of U.S. immigration law, criminal law, and European citizenship and asylum law. I am the author of Aftermath: Deportation Law and the New American Diaspora (Oxford University Press) and Deportation Nation: Outsiders in American History (Harvard University Press). I am a co-editor of The New Deportations Delirium (NYU Press) and Constructing "Illegality": Immigrant Experiences, Critiques, and Resistance (Cambridge University Press). I have also published dozens of law review articles, book reviews, and essays.

**The Meaning and Importance of U.S. Citizenship**

5. Citizenship is a universal politico-legal aspect of the modern world of nation states. Every state has a unique set of criteria for citizenship and for various statuses of noncitizens. In general terms, citizenship everywhere confers what one well-known scholar referred to in 1950 as "full membership of a community." T.H. Marshall, *Citizenship and Social Class and Other Essays* (1950) p. 8.

6. In all states, the specific legal aspects of citizenship vary. U.S. citizenship confers a unique bundle of privileges and benefits. These include the right to reside in the United States, the right not to face deportation under any circumstances, the right to vote in federal elections, the right to hold certain political offices and government positions, the ability to

2

leave and to re-enter the United States freely unencumbered by immigration criteria and processes, and eligibility for various public benefits.

7. Although many U.S. constitutional rights do not depend upon citizenship status (e.g. the right to due process of law and the rights of those charged with crimes), it is clear that U.S. citizenship is an essential element of American identity and a foundational element of American social cohesion. It facilitates social, community, and economic integration through tangible and intangible characteristics. Thus, although it is something of an overstatement to say, as Justice Earl Warren once did, that citizenship is "the right to have rights," there are many arenas of U.S. law and politics in which this is clearly true. Perez v. Brownell, 356 US 44, 46 (1958).

**The Consequences of an Executive Order Challenging Birthright Citizenship**

8. Citizenship, as noted, is both an abstract, theoretical politico-legal concept and a forensic question of proof. Unlike many other states, the U.S. does not have a centralized, national database of U.S. citizens. Most U.S. citizens demonstrate their citizenship with a state-issued birth certificate showing they were born in the U.S. As a matter of longstanding precedent under the Common Law and, most specifically, the Fourteenth Amendment of the U.S. Constitution, birth on U.S. soil *definitively* and *conclusively* proves one's citizenship, with only a very few, highly technical, rare exceptions. This system is simple and basic and was designed as such for important reasons of inclusion, equal protection, and avoidance of the development of a caste of multi-generational noncitizens.

9. As the U.S. Supreme Court noted, in the seminal 1898 case that first definitively interpreted the scope of the Fourteenth Amendment:

> "The Amendment, in clear words and in manifest intent, *includes the children born within the territory of the United States, of all other persons*, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance

and the protection, and consequently subject to the jurisdiction, of the United States…" United States v. Wong Kim Ark, 169 U.S. 649, (1898) (emphasis added)

10. U.S. immigration law, by contrast, is exceedingly complex, as many courts have recognized over many decades. Assessment of the legal status of a particular person often involves highly technical legal and factual analyses that, as one court famously noted, would "cross the eyes of a Talmudic scholar." Cervantes v. Perryman, 954 F. Supp. 1257, 1260 (1997) Birthright citizenship is one of the very few "bright lines" in immigration law and, of course, one of the most consequential. Its elimination by Executive Order would portend an immense amount of legal chaos and inevitable, irremediable harm. This is true whether the elimination or complexification of birthright citizenship is attempted as a substantive matter of law or, more subtly, as an impediment to the sorts of simple bureaucratic practices that have marked the field for centuries.

11. As the Supreme Court noted more than a half century ago, citizenship is "no light trifle to be jeopardized at any moment…" Afroyim v. Rusk, 387 U.S. at 257 (1967). This would be so even if it were the Congress that had tried to do so under one of its general or implied grants of power." *Id.* This is even more true in regard to an Executive Order. As the Court noted in *Afroyim*,

> "The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Id.* at 262.

12. The consequences of even a short-lived Executive Order of this type would involve intolerable legal chaos and potentially irremediable harm to individuals, families, and communities.

13. For one thing, it would predictably lead to wrongful, illegal arrests of people thought to be "aliens." Wrongful deportations not only cause tremendous emotional distress; but they

4

are physically dangerous and extremely difficult to rectify once a U.S. citizen is sent to a foreign country. Moreover, thousands of people apply for federal government documents every day, many of which depend upon proof of U.S. citizenship. Families of newborn children routinely apply for passports sometimes for emergency reasons to visit and help to care for sick relatives or to attend funerals with their young U.S.-born children. Many parents also apply for Social Security cards for their children at birth to facilitate eligibility for a wide array of public benefits. Thousands of older workers, in turn, apply for Social Security benefits. As the website of the Social Security Administration intones:

> "If you were not born in the U.S., proof of U.S. citizenship or lawful alien status. We must see the original document(s), or copies certified by the agency that issued them. We cannot accept documents if they have expired. We cannot accept photocopies or notarized copies." https://www.ssa.gov/benefits/retirement/planner/applying5.html

14. All of these processes and many more rely on broad, unquestioning acceptance of the norm of Fourteenth Amendment U.S. citizenship, regardless of the legal status of one's parents (except for diplomats and, perhaps, "enemy aliens" in a time of armed conflict.) A U.S. birth certificate conclusively answers the issue of one's citizenship and has done so efficiently and effectively for more than 150 years.

15. If all of this were changed—or even called into question by an Executive Order, there would be significant legal chaos and disruption. Any clerk at any level of any municipal, state or federal system might decline to issue a birth certificate or decline to recognize its legal validity as proof of citizenship. Immigration enforcement agents and those with whom they collaborate would be confused and would inevitably err. No one would know how to demonstrate citizenship. Would one have to prove the "legality" of one's parents' status? An Executive Order of this type thus implicates an enormously complicated set of legal and factual issues for which there is no training or guidance that could remotely be deemed sufficient as a matter of due process or equal protection of the laws to avoid terrible harms in practice.

5

16. Indeed, the chaos would extend far beyond the children of undocumented parents. Unless there were equally intolerable invidious discrimination based on race, national origin, linguistic ability, etc. [which is also foreseeable under such circumstances] *everyone* would have to demonstrate their citizenship with reference to the legal status of their parents. It is completely foreseeable that many thousands would suffer harms or at the very least, live for long periods of time in a bureaucratic morass of legal uncertainly and precarity.

17. Even if the Executive Order were eventually overturned by the U.S. Supreme Court, the disruptions and harms in the meantime would be immense. Many children born in the U.S. would lack legal status for indeterminate periods of time. Many would be stateless, and thus without the protection of any government at all. They would be unable to attain legal status or naturalize for many years, if ever. Children born in the U.S. would essentially be relegated to a subordinate caste of native-born Americans. *This was precisely the situation that the Fourteenth Amendment was designed to eliminate.* Indeed, it is well-established by Supreme Court precedent and scholarly research that a primary jurisprudential aim of the Fourteenth Amendment was to remove not only the specific holding—but *all vestiges* of the explicitly racist and exclusionary reasoning of the infamous case of Dred Scott v. Sandford, 60 U.S. (19 How.) 393 (1857). In contrast, an Executive Order that questions birthright citizenship threatens to take us back to pre-Civil War harms that we had long thought were historical relics.

Signed under the pain and penalties of perjury this 20 day of January 2025.

Daniel Kanstroom