# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| O. DOE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:25-CV-10135 |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the | ) | |
| United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## BRIEF OF THE STATE OF TENNESSEE AS AMICUS CURIAE
## IN SUPPORT OF DEFENDANTS

---

## INTRODUCTION

Constitutional assessment of a President's policies should rest on sound legal analysis, not snap judgments. Yet Plaintiffs dismiss any need for a deep dive here, casting their maximalist reading of the Citizenship Clause as too settled to debate. Never mind that a mere-presence rule cannot be right all the time, as Plaintiffs concede. Or that Plaintiffs' position perversely rewards illegal behavior with birthright citizenship in a manner no drafter or ratifier of the Citizenship Clause endorsed. Because Plaintiffs see their reading as a foregone conclusion, they say any anomalies should not detain this Court in enjoining an Executive Order facially and nationwide.

But they should. Tennessee writes to emphasize two points. To begin, Plaintiffs' first-principles case for a mere-presence approach to the Citizenship Clause is not only not obvious—it has serious problems under text, history, and Supreme Court precedent. Contemporaneous sources instead support what common sense suggests: Conferring United States citizenship requires a more meaningful connection than mere presence by happenstance or illegality. That connection, evidence repeatedly instructs, was parental domicile. Supreme Court precedent likewise cuts against a mere-presence rule and for a domicile-based rule. By focusing on residency, the Executive Order does not infringe the Citizenship Clause, let alone facially. Contra Plaintiffs' contentions, this is not an open-and-shut case.

Regardless, even if this Court agrees with Plaintiffs on the merits, entering Plaintiffs' sweeping, universal injunction is beyond the judicial power. Injunctive relief, the Supreme Court has stressed, must be no more burdensome than necessary to address a plaintiff's injury. And here, that principle dictates that any relief be limited in two ways: first, it must extend only to the Plaintiffs; and second, it must prohibit only the unconstitutional applications of the challenged Executive Order, if there are any.

**ARGUMENT**

Plaintiffs take the maximalist position on the Citizenship Clause. Under it, all that matters for purposes of birthright citizenship is where a child is born; considerations of the parents' legal status or residency are irrelevant. But to prevail against the President's Executive Order, Plaintiffs must show that their mere-presence reading of the Citizenship Clause is constitutionally compelled. And on relief, they must justify any injunction as consistent with Article III and the limits on courts' equitable power. Their challenge to the Executive Order has faults on each front.

**I.    There Is No Clear-Cut Constitutional Case for Plaintiffs' Mere-Presence Position.**

The Citizenship Clause of the Fourteenth Amendment provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1. Though the parties dispute the effect of that language, it's instructive to first consider a few points that most accept.

*First*, the Fourteenth Amendment aimed to constitutionally "ingraft" the protections of the Civil Rights Act of 1866. Cong. Globe, 39th Cong., 1st Sess. App. 82 (1867) (statement of Rep. Miller). Relevant here, the 1866 Act directed that "all persons born in the United States *and not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States," no matter their "race and color" and "without regard to any previous condition of slavery or involuntary servitude." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 (emphasis added). Given their close relationship, the Act's history and ordinary public meaning have long been understood to bear on interpretation of the Citizenship Clause. U.S. Br. 17 (collecting cases).

*Second*, there is "near-universal consensus" that both the Citizenship Clause and the Civil Rights Act of 1866 sought to overturn the Supreme Court's odious holding in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which treated U.S.-born descendants of African slaves as property rather than persons entitled to U.S citizenship. Amy Swearer, *Subject to the (Complete)*

*Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135, 145 (2019).  The provisions also sought to redress the "systematic denial of civil rights to freed slaves" by prohibiting race-based discrimination in the conferral of citizenship or provision of civil rights.  *Id.* at 146.  But parental race or alienage is *not* parental residency, and it is crucial to avoid conflating these legally distinct concepts.

*Third*, while Plaintiffs advocate for a mere-presence rule, they must at the same time agree that their pure *jus soli* approach does not hold in all cases.  Specifically, Plaintiffs and their supporters stipulate that presence is not enough for children of (i) Indian tribal members (who obtain citizenship only through statute, *see* 8 U.S.C. § 1401(b)), (ii) foreign diplomats, and (iii) at least some others, like enemy combatants, who are immune from U.S. law.  *E.g.*, James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 369 (2006).  This means that the core question is not, as many commentators cast it, whether all persons born within U.S. borders obtain citizenship—even Plaintiffs agree that's not right.  It's whether "born ... in the United States, and subject to the jurisdiction thereof" excludes only some unstated set of limited exceptions based on then-prevailing understandings of immunity (Plaintiffs' view), or provides a generally applicable rule that bars all those without meaningful residence-based ties to the United States (Defendants' view).

*Fourth*, immigration restrictions did not arise until the early 1880s, after the Citizenship Clause's ratification.  There is thus no contemporaneous discussion supporting Plaintiffs' maximalist position applying the Clause to children whose parents are present in the United States only unlawfully and after evading detection.  And if rewarding parental illegality had come up, it would have run afoul of the "deep and firm" legal rule *Ex turpi causâ non oritur actio*, which

prohibited enforcing illegal contracts or rewarding illegal acts. *Brooks v. Martin*, 69 U.S. 70, 75-76 (1864); *see, e.g.*, *Bank of U.S. v. Owens*, 27 U.S. 527, 539 (1829).

To sum up, then, Plaintiffs' first-principles position is that a provision that (i) aimed to confer citizenship on freed slaves and thus (ii) does not address non-residents or those unlawfully present, nonetheless (iii) binds the Executive Branch to automatically confer citizenship in most (but not all) cases (iv) in a manner rewarding those who illegally enter the country. That counterintuitive "fallout" should raise red flags about the "implausibility" of Plaintiffs' interpretation. *Van Buren v. United States*, 593 U.S. 374, 394 (2021). And as it turns out, there are serious textual, historical, and precedential problems with Plaintiffs' mere-presence rule.

## A.    Text

There are two apparent textual problems with Plaintiffs' mere-presence position. At the outset, the Clause directs that covered persons not only must be "born … in the United States"; they also must be "subject to the jurisdiction thereof"—a limitation that was added later to the originally proposed text. U.S. Const. Amend. XIV, § 1; *see* Swearer, *supra*, at 143. So the text, as revised, must do something different than adopt England's common-law rule of pure *jus soli*, which turns only on the location of a child's birth. Plaintiffs do not dispute as much.

The parties instead debate precisely *how* the Clause departs from a pure *jus soli* approach. Plaintiffs contend that "jurisdiction" is a low bar, referring only to the bare sense of being subject to *some* U.S. control. But as the United States explains, that narrow meaning doesn't work—after all, tribal members and foreign diplomats are "in some way subject to the basic level of sovereign authority the United States government exerts over its geographical territory," even though their "exclusion from birthright citizenship is uncontested." Swearer, *supra*, at 149 & n.35 (collecting examples of U.S. legal authority over diplomats); U.S. Br. 15-16 (same, for diplomats and Indians).

Plaintiffs' contrary reading further places the Citizenship Clause in collision with the 1866 Act, which allows citizenship only to those "not subject to any foreign power." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27. That phrasing "specifically intended to withhold birthright citizenship from those who did not owe a complete, permanent allegiance to the United States and who were not part of the 'American people.'" Swearer, *supra*, at 157-59 (collecting sources). Historical evidence indicates that the metric for measuring the requisite connection to U.S. jurisdiction was domicile or lawful permanent residence. *Infra* pp. 6-8. Temporary presence by a parent who legally resided in a foreign country was not enough.

A second textual feature of the Citizenship Clause points to a domicile-based approach: The provision's premise is that it applies only to persons who also have a "State *wherein they reside*." U.S. Const. Amend. XIV, § 1 (emphasis added). The term "reside," in context, connotes a person's legal residence or domicile. *See, e.g.*, "Residence," S. Rapalje & R. Lawrence, 2 *A Dictionary of American and English Law* 1114 (1888) (collecting cases treating "residence" as "synonymous with 'domicile'"); "Residence, Legal," 2 *A Dictionary of Words and Phrases Used in Ancient and Modern Law* 692 (1899) ("[t]he place where a man has his fixed place of abode, where he can exercise his political rights and is subject to personal taxation"). That's particularly so when viewed against then-prevailing concepts of complete jurisdiction and political allegiance, with which domicile's meaning was closely aligned. U.S. Br. 19-20; *see* Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 488-90 (2015) (colleting authorities); *accord* "Domicile," 1 *Dictionary of American and English Law*, *supra*, at 410 ("The question where a person is domiciled may be important, because it is by the law of that place that his civil status … is regulated.").

The general rule of "domicile of origin" or "natural domicile," moreover, is that a child inherits his parent's domicile at birth and that domicile prevails until "clearly abandoned and another taken" via "fixed and settled habitation." *Somerville v. Somerville* (1801) 31 Eng. Rep. 839, 840, 842; 5 Ves. Jun. 750, 750, 755; *see* U.S. Br. 20. "Thus," as an 1888 American and English law dictionary instructed, "if a husband and wife domiciled in England take a voyage to India, and a child is born to them on the voyage, or in India before they acquire a domicile there, its domicile is English." "Domicile of origin," *Dictionary of American and English Law*, *supra*, at 410. The Citizenship Clause's reference to "reside" thus appears to align with a domicile-based approach to the Citizenship Clause and exclude persons whose parents lack permanent or lawful residence in the United States.

### B.    Contemporaneous History and Practice

A core plank of Plaintiffs' position is congressional and Executive Branch practice that postdates the Citizenship Clause's ratification. But because the "meaning of constitutional text is fixed at the time of its ratification," the "history that matters most is the history surrounding the ratification of the text." *United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring). Tennessee does not purport to fully survey the complex historical record here. Others have, though. *See* Swearer, *supra*; Lollman, *supra*; Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010). And suffice it to say, a range of contemporaneous sources[1] cast significant doubt on Plaintiffs' mere-presence position.

These include debates and commentary surrounding the passage and ratification of the 1866 Act and the Fourteenth Amendment, which pervasively linked eligibility to legal residency:

---

[1] The historical sources quoted throughout this section are collected in Swearer, *supra*, and Lollman, *supra*.

- Senator Trumbull, the Chairman of the Committee of the Judiciary and primary drafter of the 1866 Act's citizenship provision, explained that the Act excluded "persons *temporarily resident* in [the United States] whom we would have no right to make citizens." Even though "a sort of allegiance was due to the country from" such persons, they were not those "who owe allegiance to the United States" in the sense the citizenship clause was understood to require. Cong. Globe, 39th Cong., 1st Sess. 572 (1866) (statement of Sen. Trumbull) (emphasis added).

- Senator George Henry Williams, a member of the Joint Committee on Reconstruction, wrote similarly: "In one sense, all persons born within the geographical limits of the United States are subject to the jurisdiction of the United States, *but they are not subject to the jurisdiction of the United States in every sense*." Cong. Globe, 39th Cong., 1st Sess. 2897 (1866) (statement of Sen. Williams) (emphasis added).

- Summarizing the Civil Rights Act for President Johnson, Senator Trumbull explained that the Act "declares 'all persons' born of *parents domiciled in the United States … to be* citizens of the United States." Swearer, *supra*, at 158-59 (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson, *in* Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress, Washington, D.C, Doc. No. 28152) (emphasis added).

- In explaining how the Citizenship Clause tracked the Civil Rights Act, Senator Howard emphasized that the Clause "will not, of course, include persons born in the United States *who are foreigners, aliens*, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (statement of Sen. Howard) (emphasis added).

Early Executive Branch practice was in accord:

- In at least two instances in the 1880s, two different Secretaries of State denied citizenship to persons born in the United States. The reason? Their parents had "remained domiciled" overseas. Swearer, *supra*, at 170. Letters setting out their reasoning confirmed that "[t]he fact of birth" in the United States, "under circumstances implying alien subjection, establishes of itself no right of citizenship." Letter from Mr. Frelinghuysen, Sec'y of State, to Mr. Kasson, Minister to Ger. (Jan. 15, 1885), *in* 3 John Bassett Moore, LL.D., A Digest of International Law § 373, at 279 (1906); Letter from Mr. Bayard, Sec'y of State, to Mr. Winchester, Minister to Switz. (Nov. 28, 1885), *in* 3 John Bassett Moore, LL.D., A Digest of International Law § 373, at 280 (1906); *see also* Lolling, *supra*, at 479-80.

- The Secretary of the Treasury applied similar reasoning in an 1890 opinion letter, which denied "citizenship of a child born to a would-be immigrant who had not 'landed' but was awaiting immigration approval." Swearer, *supra*, at 171. The Secretary explained: "I am, therefore, of the opinion that the child in controversy born during the temporary removal of the mother from the importing vessel to a lying-in hospital for her own comfort, pending further examination as to whether she belongs to the prohibited class of immigrants, did not become, by reason of its birth, under such circumstances, an American citizen." Letter from F.A. Reeve, Acting Solicitor of the Treasury (Mar. 4, 1890), *in* XI Documents of the Assembly of the State of New York, 113th Sess., No. 74, 6, 47

Likewise, 1800s and early 1900s commentary recognized parental domicile as a distinguishing feature between the British and U.S. rules on citizenship:

- Justice Joseph Story, writing in his *Commentaries on the Conflict of Laws*, urged in 1834 that "[a] reasonable qualification o[n] the rule" of *jus soli* "would seem to be, that it should not apply to the children of parents … who were abiding there for temporary purposes." Joseph Story, Commentaries on the Conflict of Laws § 48 (Boston, Little, Brown & Co. 6th ed. 1865) (quoted in Lollman, *supra*).

- In an 1881 book entitled *A Treatise on Citizenship*, Alexander Porter Morse asserted that "[t]he words 'subject to the jurisdiction thereof' exclude[d] the children of foreigners transiently within the United States … as … subjects of a foreign nation." Alexander Porter Morse, A Treatise on Citizenship 248 (Boston, Little, Brown & Co. 1881).

- In an 1891 law review article, former Supreme Court Justice Samuel Miller observed: "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction." Samuel Freeman Miller, LL.D., Naturalization and Citizenship, *in* Lectures on the Constitution of the United States 275, 279 (J. C. Bancroft Davis ed., 1893).

- Contrasting the British and U.S. rule, an 1898 comment in *Yale Law Journal* wrote: "Moreover, in this country, the alien *must be permanently domiciled*, while in Great Britain birth during a mere temporary sojourn is sufficient to render the child a British subject." Comment, 7 Yale L.J. 365, 367 (1898) (emphasis added).

- Constitutional scholar Henry Campbell Black distinguished between U.S.-born children of "a stranger or traveler passing through the country, or temporarily residing here," who are not entitled to citizenship, and "children, born within the United States, *of permanently resident aliens*, who are not diplomatic agents or otherwise within the excepted classes," who are entitled to citizenship no matter their race. *Handbook of American Constitutional Law* 634 (3d ed. 1910) (emphasis added).

- International law treatises reached the same conclusion. *See, e.g.*, William Edward Hall, M.A., *A Treatise on International Law* 224-25, 227 (5th ed. 1904) ("In the United States it would seem that the children of foreigners in transient residence are not citizens."); Hannis Taylor, LL.D., *A Treatise on International Public Law* 220 (1901) ("It appears, therefore, that children born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'").

To be sure, as with many disputed constitutional questions, Plaintiffs can point to counterevidence. But if nothing else, the excerpts above and sources collected by scholars shows that Plaintiffs oversell their mere-presence position as the uniform historical consensus.

C.        **Supreme Court Precedent**

Nor does Supreme Court precedent mandate Plaintiffs' maximalist reading of the

Citizenship Clause.  Quite the contrary: Caselaw emphasizes the importance of parental domicile

to birthright citizenship and shuns mere-physical-presence rules in the immigration context.

1.        The earliest cases interpreting the Fourteenth Amendment point towards a

domicile-based approach.  In 1872, the Court's decision in the *Slaughter-House Cases* stated that

the Citizenship Clause "was intended to *exclude* from its operation children of ministers, consuls,

and *citizens or subjects of foreign States born within the United States*."  83 U.S. 36, 73 (emphasis

added).  Two years later, the Court observed that "common-law" principles informed "who shall

be natural-born citizens" and noted "doubts" as to whether children of "aliens or foreigners" born

in the United States constituted "natural-born citizens."  *Minor v. Happersett*, 88 U.S. 162, 167-

68 (1874).  The Court recognized that "it was never doubted that all children born in a country of

parents who were its citizens became themselves, upon their birth, citizens also."  *Id.* at 167.  After

observing that "[s]ome authorities go further and include as citizens children born within the

jurisdiction without reference to the citizenship of their parents," the Court noted that "[a]s to this

class there have been doubts."  *Id.* at 168.  These post-ratification statements cut against Plaintiffs.

The Court's decision in *Elk v. Wilkins*, 112 U.S. 94 (1884), also counsels against a mere-

presence approach.  There, the Court assessed how the Citizenship Clause applied to an Indian

born into a tribe who then severed tribal relations.  *Id.* at 99.  The Court held that "Indians born

within the territorial limits of the United States, … although in a geographical sense born in the

United States" were not "'born in the United States and subject to the jurisdiction thereof,' within

the meaning of the first section of the fourteenth amendment."  *Id.* at 102.  The Indian must have

been "completely subject to [the United States's] political jurisdiction, and owing them direct and

immediate allegiance." *Id.*  But he was not, just as "the children of subjects of any foreign government born within the domain of that government" would not qualify for citizenship.  *Id.*

*Wong Kim Ark*—on which Plaintiffs principally rely—cuts against them.  The Court there decided how the Citizenship Clause applied to a U.S.-born child of Chinese aliens lawfully present and permanently domiciled in the United States.  *United States v. Wong Kim Ark*, 169 U.S. 649, 652-53 (1898).  So unlawful presence was not at play.  Still, the Court emphasized throughout that the alien parents were "resident[s]" and "domiciled within the United States."  *Id.* at 652, 653, 693, 696, 705.  It reasoned that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States" for purposes of the Clause.  *Id.* at 693 (emphasis added).  And it held that "Chinese persons … *so long as they are permitted by the United States to reside here*" enjoy the same birthright protections "as all other aliens residing in the United States."  *Id.* at 694 (emphasis added).  In so doing, the Court expressly drew from *Benny v. O'Brien*, 32 A. 696 (N.J. 1895), which interpreted the Citizenship Clause to require that parents be "domiciled here," and thus to exclude "those born in this country of foreign parents who are temporarily traveling here."  *Id.* at 698.

*Wong Kim Ark*'s emphasis on parental domicile was no accident.  It responded directly to the parties' briefing and to the dissent's concern about covering persons "born of aliens whose residence was merely temporary, either in fact or in point of law."  *Id.* at 729 (Fuller, C.J., dissenting).  Not surprisingly, "[i]n the years immediately following *Wong Kim Ark*, several commentators read the Court's reference to domicile as actually doing work in the opinion." Lollman, *supra*, at 462, 471.  So did the Court and the Department of Justice.  *See* U.S. Br. 31-33.

The Supreme Court's much later, 5-4 decision in *Plyler v. Doe* likewise lends little help to Plaintiffs.  *Plyler* did not confront or purport to resolve any Citizenship Clause question.  Instead,

it addressed only whether children's "undocumented status" supported a state law denying them benefits under the Equal Protection Clause. 457 U.S. 202, 220-21 (1982). But entitlement to *some* constitutional protections does not equate to lawful residency or entitlement to *citizenship*, as *Plyler* confirms by noting that children in the country illegally "are subject to deportation." *Id.* at 215, 226. Note, too, that the Court's recited rule from *Wong Kim Ark* again referenced domicile: "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 211 n.10 (quoting *Wong Kim Ark*, 169 U.S. at 693 (emphasis added)).

      2.     Additional precedent clashes with Plaintiffs' insistence that a person's mere physical presence in the United States must control determination of his legal status.

      The Supreme Court has long recognized that not every alien physically present within U.S. soil, water, or airspace "has *effected an entry* into the United States" for "constitutional purposes." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see United States v. Ju Toy*, 198 U.S. 253, 263 (1905). *Kaplan v. Tod*, 267 U.S. 228 (1925), is instructive. There, the Court rejected a mere-presence rule when considering whether children obtain citizenship through their parents' naturalization. A mother brought her daughter to Ellis Island to join her father, who legally resided in the country. *Id.* at 229. The daughter was denied admission, but the outbreak of the First World War prevented her deportation. *Id.* After detaining the girl for nearly a year, the government paroled her. *Id.* She then lived with her father in the United States for the better part of a decade. *Id.* During this time, the girl's father naturalized. *Id.* at 230. And when the government later sought to deport the girl, she argued that she had obtained citizenship because she was "'dwelling in the United States'" when her father naturalized. *Id.*

The Court disagreed. It held that the girl never "lawfully … landed in the United States," and "until she legally landed," she "could not have dwelt within the United States." *Id.* (quotations omitted). Legally, she remained "at the boundary line and had gained no foothold in the United States." *Id.* Absent a permissible "entry," the Court concluded, "an alien can neither 'dwell' nor 'reside' within the United States, as those words are understood in the immigration context." *Lopez-Sorto v. Garland*, 103 F.4th 242, 252 (4th Cir. 2024) (quoting *Kaplan*, 267 U.S. at 229-30).

The Supreme Court has invoked the at-the-border legal fiction time and again. *E.g.*, *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958).[2] Under it, an alien may be "physically within our boundaries," but treated under the law "as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate." *Ju Toy*, 198 U.S. at 263. And that rule applies to aliens who "arrive at ports of entry" or are detained "after unlawful entry," for example, even if later "paroled elsewhere in the country" pending removal. *Thuraissigiam*, 591 U.S. at 139.

The at-the-border legal fiction in the Court's precedents aligns with the historical domicile-based approach to the Citizenship Clause. It makes no sense to recognize the "legal fiction of extraterritoriality, wherein ambassadors and diplomats, though literally present on United States soil, were considered to be still living in the sending state," Swearer, *supra*, at 143, yet ignore the similarly well-established legal fiction when it comes to aliens paroled into the country. The clash between Plaintiffs' Citizenship Clause reading and settled immigration-law principles further weighs against endorsing their mere-presence position.

---

[2] So have scores of circuit court cases. *See, e.g.*, *Lopez-Sorto*, 103 F.4th at 252; *Meza v. Renaud*, 9 F.4th 930, 934 (D.C. Cir. 2021); *Gonzalez v. Holder*, 771 F.3d 238, 245 (5th Cir. 2014); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2007).

## II.    Plaintiffs Are Not Entitled to the Universal Relief They Seek.

If this Court does issue an injunction, it should reject Plaintiffs' invitation to wield the judicial power to resolve cases or controversies as a means of overriding an Executive policy throughout the country.  Instead, the Court should tailor any relief in at least two ways.

*First*, any injunctive relief must be limited to the Plaintiffs.  As a rule, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added).  To that end, an injunction "must ... be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Gill v. Whitford*, 585 U.S. 48, 68 (2018).  This limitation follows from "the nature of federal judicial power," as enshrined in Article III itself.  *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024) (Mem.).  Article III "confines the 'judicial power' to 'Cases' and 'Controversies.'" *Id.* (quoting U.S. Const. art. III, § 2).  It does not permit federal courts to "issue advisory opinions" or address legal issues "'in the abstract.'"  *Id.* (quoting *California v. Texas*, 593 U.S. 659, 672 (2021)).  Courts thus cannot "lawfully enjoin the world at large or purport to enjoin challenged laws themselves."  *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (cleaned up).  They "must operate in a party-specific and injury-focused manner."  *L.W.*, 83 F.4th at 490.

So to the extent the threatened application of the Executive Order to Plaintiffs gives rise to an Article III injury, an injunction preventing application of the order *to Plaintiffs* would fully redress that injury.  An injunction that goes "further than that" and "order[s] the government to take (or not take) some action with respect to those who are strangers to the suit," on the other hand, would exceed "the judicial role of resolving cases and controversies."  *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).  That is why "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or

ordinances except with respect to the particular federal plaintiffs." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *see also United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995) (holding that a federal statute was unconstitutionally overbroad but that injunctive relief "should be limited to the parties before the Court" "when a narrower remedy [would] fully protect the litigants"). And it is also why the government generally remains free to enforce challenged provisions—even if enjoined as to specific plaintiffs—against anyone else. *See Doran*, 422 U.S. at 931 ("[T]he State is free to prosecute others who may violate the statute.").

That Plaintiffs have raised a facial challenge to the Executive Order changes nothing. Limits on the scope of "judicial power" apply with full force whether the challenge is facial or as applied. *L.W.*, 83 F.4th at 490. No matter the substantive theory, "[d]istrict courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury.'" *Id.* (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)). Relief that goes further and applies to unnamed nonparties across the country necessarily exceeds "the power of Article III courts" and flouts "longstanding limits on equitable relief." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see also L.W.*, 83 F.4th at 490.[3]

*Second*, any injunctive relief must be limited to the allegedly unconstitutional applications of the challenged Executive Order. That is, even if this Court concludes that some applications of the Executive Order are unconstitutional, it does not follow that *all* applications should be enjoined. Rather, the constitutionality of Executive Orders, like statutes, should be assessed

---

[3] Plaintiffs' APA claim cannot justify broader relief either. True, the APA authorizes courts to "hold unlawful and set aside agency action" that violates the Act. 5 U.S.C. § 706(2). But "agency action" is a prerequisite to that remedy, *id.*, and it does not exist here. "[T]he President is not an 'agency,'" so his actions "are not reviewable under the APA" at all. *Dalton v. Specter*, 511 U.S. 462, 470 (1994). And while Plaintiffs have named some government-agency defendants, Plaintiffs have neither identified nor challenged any specific implementation action.

provision by provision, and courts have an "obligation" to use severance "to maintain as much of the order as is legal." *Washington v. Trump*, 858 F.3d 1168, 1172 (9th Cir. 2017) (Kozinski, J., dissenting); *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (assuming "the severability standard for statutes also applies to executive orders"). Applied here, that rule restricts any remedy to "enjoin[ing] the unconstitutional *applications* of the [Order] while preserving the other valid applications." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 342 (6th Cir. 2009); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006).

As discussed, evidence supports reading the Citizenship Clause to turn on parental domicile or lawful residency. If that is right, then there are a host of situations in which the Executive Order can be applied with no constitutional problems. That at a minimum means Plaintiffs' *facial* challenge to the Executive Order must fail. *See Nat'l Treasury Emps. Union v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989) (applying "difficult" to satisfy facial standard from *United States v. Salerno*, 481 U.S. 739 (1987), to an Executive Order). To the extent that there remain situations outside the bounds of constitutional application, injunctive relief should be narrowly crafted to "enjoin only the unconstitutional applications … while leaving other applications in force." *Ayotte*, 546 U.S. at 329.

## CONCLUSION

A wide range of sources close in time to the Citizenship Clause's ratification support rejecting Plaintiffs' mere-presence position outright. At a minimum, any injunction must be appropriately tailored, not universal.

Dated: February 3, 2025                   Respectfully submitted,

                                          Jonathan Skrmetti
                                            *Attorney General and Reporter*

                                          J. Matthew Rice*
                                            *Solicitor General*
                                          Whitney D. Hermandorfer*
                                            *Director of Strategic Litigation*
                                          */s/ Andrew Coulam*
                                          Andrew Coulam
                                            *Deputy Attorney General*
                                          OFFICE OF TENNESSEE ATTORNEY GENERAL
                                          P.O. Box 20207
                                          Nashville, TN  37202
                                          (615) 741-3491
                                          matt.rice@ag.tn.gov
                                          whitney.hermandorfer@ag.tn.gov
                                          andrew.coulam@ag.tn.gov

                                          *Counsel for the State of Tennessee*


                                          *Application for admission pro hac vice pending*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2025, the foregoing document was filed using the Court's ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

*/s/ Andrew Coulam*
Andrew Coulam
